UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____

TERESA FLETCHER,                                    Civil Action No: 22-cv-8856

                    Plaintiff,                      **COMPLAINT**

        -against-

GENOMONCOLOGY, LLC, and BRAD WERTZ

                    Defendants.

_____

      PLAINTIFF TERESA FLETCHER, by her attorney Goddard Law PLLC, whose offices are located at 39 Broadway, Suite 1540, New York, New York 10006, alleges upon knowledge with respect to herself, and upon information and belief as to all other matters, as follows:

## PRELIMINARY STATEMENT

1.     This is a civil action brought on behalf of Plaintiff Teresa Fletcher, (hereinafter "Plaintiff") against Defendant GenomOncology, LLC (hereinafter "Defendant GenomOncology") and Defendant Brad Wertz for gender and pregnancy discrimination, equal pay violations, and retaliation in violation of Title VII, the Pregnancy Discrimination Act, the Equal Pay Act, the New York State Equal Pay Act, the New York State Human Rights Law, and the New York City Human Rights Law, as well as together with any and all other causes of action which can be reasonably inferred from the facts as set forth below.

## PARTIES

2.     Plaintiff is a female citizen of the United States who lives in New York, New York. Plaintiff was subject to gender and pregnancy discrimination, equal pay violations, and retaliation that resulted, ultimately, in her termination from Defendant GenomOncology.

3.      Plaintiff was, at all times relevant herein, Defendant GenomOncology's "employee" within the meaning of all relevant Federal, State, and local laws, including, but not limited to, Title VII, the Pregnancy Discrimination Act, the Equal Pay Act, the New York State Equal Pay Act, the New York State Human Rights Law, and the New York City Human Rights Law. At all relevant times, Defendant GenomOncology employed more than 15 employees.

4.      Upon information and belief, Defendant GenomOncology's headquarters are located at 1138 West 9th Street, Suite 400, Cleveland, Ohio 44113. At all times relevant, Plaintiff worked remotely for the entirety of her employment at Defendant GenomOncology while domiciled in New York, New York.

5.      Defendant GenomOncology was, at all times relevant herein, Plaintiff's "employer," within the meaning of all relevant Federal, State, and local laws, including, but not limited to, the Title VII, the Pregnancy Discrimination Act, the Equal Pay Act, the New York State Equal Pay Act, the New York State Human Rights Law, and the New York City Human Rights Law.

6.      Defendant Brad Wertz was, at all times relevant herein, an employee of Defendant GenomOncology who supervised Plaintiff and communicated with her while she was domiciled in New York State.

## **INTRODUCTION**

7.      In or about May 2017, Plaintiff met Manuel Glynias, ("Founder Glynias") the Founder of Defendant GenomOncology.

8.      Defendant GenomOncology is a company in Cleveland, Ohio that provides the healthcare community with data-driven insights to improve cancer care. That is, Defendant GenomOncology's platforms take genomic data from patients suffering from cancer, analyze the

data, and then provide clinical decision-making support for health care partners so that they can make the best decisions about their patients' cancer treatments.

9.      Plaintiff was excited to meet Founder Glynias, because she admired Defendant GenomOncology's platform and the way it assisted health care partners with deciding which cancer treatment was best for their individual patients. Plaintiff told Founder Glynias that she admired the platforms and said that she would "love to work for" him.

10.     Plaintiff explained to Founder Glynias that given her significant and expansive contacts with oncologists (cancer doctors) and cancer centers throughout the United States because of her former and current employment, she could help Defendant GenomOncology expand into a market that included oncologists and cancer centers, which they had not done before.

11.     Founder Glynias became extremely excited about hiring Plaintiff, and readily agreed, and offered her a job as Vice President of Business Development (i.e., Sales). Plaintiff told Founder Glynias that she needed to work remotely from New York, and Founder Glynias assured her that this would not be a problem.

12.     Founder Glynias told Plaintiff that in order to be hired she would have to interview with the CEO of Defendant GenomOncology, Brad Wertz ("Defendant Wertz").

13.     Founder Glynias rolled his eyes and said that the interview was "pro forma" and she should not take it seriously. He told Plaintiff that Defendant Wertz was "annoying," that he didn't know the industry or the issues "at all," that he was just a "figurehead" because he provided the investment money for the company, and that he knew nothing about genomics or cancer care.

14.     At the conference, Plaintiff also introduced Founder Glynias to Kelly Choi, an MD (medical doctor) with whom she worked at her company ("Ms. Choi"). Plaintiff and Ms. Choi also

explained to Founder Glynias how crucial Ms. Choi would be to Defendant as a medical doctor who knew the oncology industry, and he became excited to hire them both.

## FACTUAL BACKGROUND

### Plaintiff Takes a Pay Cut, but Is Told She Will Receive Future Bonuses and Cash Payouts

15.    In or about the end of May, Plaintiff held her "interview" with Defendant Wertz at a restaurant in Cleveland, Ohio. Defendant Wertz spent most of the time stating repeatedly that he was "a millionaire," and telling her how allegedly successful his prior companies were.  He also said condescendingly that Founder Glynias "did not know how to run" Defendant GenomOncology. Plaintiff was concerned that the two leaders of Defendant GenomOncology spoke about each other in such a demeaning manner and tried to refocus the conversation on business.

16.    Plaintiff told Defendant Wertz what she could bring to Defendant GenomOncology.  She said that she had extensive contacts with oncologists and cancer centers, which would help Defendant GenomOncology break into that market.  She also stated that given her prior experience, she was an "expert" at selling product and creating a market strategy, and that she "knew what it took to succeed."

17.    Defendant Wertz agreed, and offered Plaintiff the job, with a starting salary of $170,000, which was $30,000 less than she was making at her current position.  When Plaintiff told Defendant Wertz that she could not take that big of a pay cut, he assured her that he would give her options in the company that would be "worth a million dollars," and that he gave "millions of dollars in bonuses to salespeople over the years."

18.    Plaintiff was wary of taking such a large pay cut, but she believed in Defendant GenomOncology's platforms. She told Defendant Wertz that she would accept the job, but she

would expect bonuses, and a yearly increase in her salary.  Defendant Wertz assured her that she would be making "so much money" at Defendant GenomOncology, and hired her via a letter dated May 23, 2017, a couple of weeks after their meeting.

19.     Defendant Wertz also agreed to hire Ms. Choi as Chief Commercial Officer ("CCO Choi") after she was also recommended by Founder Glynias.

20.     Upon information and belief, Plaintiff and Ms. Choi were the first female executives that Defendant Wertz hired at Defendant.  Also, upon information and belief, Defendant Wertz would never have hired two female executives had they not been championed and essentially hired by Founder Glynias, who recognized their importance to the future of Defendant.

**Defendant Wertz Fosters a Hostile Work Environment for Plaintiff,
and for Other Female Employees in front of Plaintiff**

21.     On or about June 21, 2017, Plaintiff began work at Defendant GenomOncology. Plaintiff was surprised when she started that there was no Human Resources department. Plaintiff did not receive any information on anti-discrimination, anti-retaliation, or anti-sexual harassment policies.

22.     Plaintiff was also surprised that when she started there was not one female member of the executive team, and that Defendant GenomOncology's entire Board of Directors was made up of White men.

23.     At Defendant, each member of the executive team reported to Defendant Wertz, including Ian Maurer, the Chief Technical Officer ("CTO Maurer"), David Lasecki the Chief Strategy Officer ("CSO Lasecki"), Justin Yeakly, the VP of Product ("VP Yeakly"), and Baiju Parikh, Vice President of Sales and Marketing ("VP Parikh"), who were all men except for Plaintiff and CCO Choi.

24.    Plaintiff was instructed that she was to work in conjunction with CSO Lasecki and VP Parikh in growing and expanding sales at Defendant as a "Business Development" (i.e., Sales) team.

25.    After working at Defendant GenomOncology for some months, Plaintiff saw that Defendant Wertz was hostile, degrading, belittling, and condescending to women, including her.

26.    Defendant Wertz held weekly Executive Team meetings with Plaintiff, Founder Glynias, CTO Maurer, CSO Lasecki, VP Yeakly, VP Parikh, who were all men except for Plaintiff and CCO Choi.

27.    Defendant Wertz showed up to the meetings disheveled and unprepared, and almost always told them he was "hung over" or "had too much to drink last night."  He insisted that the meetings be after lunch time, because he said he was "too hung over" to come in the morning. He also continuously swore and used foul language and expletives when speaking.

28.    When Plaintiff tried to review the financials for the month and talk about sales and important business clients, Defendant Wertz interrupted her, disrespected her, told her she "didn't know anything," furiously dismissed her ideas and prospects, and yelled at her to listen to him. He "mansplained" topics to Plaintiff, by "explaining" topics that Plaintiff, a businesswoman with significant expertise and experience, was already an expert in. Defendant Wertz did not do this to the male members of the team, or male employees.

29.    Defendant Wertz also interrupted, belittled, and "mansplained" medical topics to COO Choi, a woman, even though she was a medical doctor.

30.    Plaintiff also saw that he was hostile and belittling to other female employees, including young female employees.  Among other things, he bragged about how much money he

had, or the alleged fact that he was a "millionaire" in order to assert dominance over young, female employees.  The young female employees were intimidated by him and fearful of him.

31.     Defendant Wertz was also belittling, patronizing, and belligerent with women whom he met or had phone calls with from outside of the company.

32.     Most alarmingly, when it came time for employee performance evaluations, Defendant Wertz asked employees to meet him at his remote vacation cabin in the woods outside of Cleveland. Several young, female employees confided in COO Drobnik, who told Plaintiff, that they felt very uncomfortable going to meet Defendant Wertz in a remote cabin.  One female employee objected strongly and repeatedly to COO Drobnik about this, saying:  "Why would I go to a remote cabin to meet a male manager, when we have an office?"

33.     COO Drobnik told Defendant Wertz that he could not meet employees at the cabin because young female employees were uncomfortable with this. He stated that that was "crap," and "bullshit" and he didn't see anything wrong with it.  After COO Drobnik insisted, he very reluctantly (and angrily) agreed to meet with the female employees inside the Cleveland office, but met a number of the men at the cabin.

34.     In addition, Defendant Wertz asked the men at the company to long golf games during work hours and then spoke incessantly about the golf games and the drinking that they did while golfing on the phone or on video calls in front of Plaintiff.  He did not invite Plaintiff or COO Choi to golf, even when Plaintiff visited the Cleveland office for in-person meetings.

35.     Defendant Wertz also hired male colleagues who were "buddies" from his prior jobs to work at Defendant GenomOncology, even though they were absolutely not qualified for the positions, so that he could go out drinking with him, and get drunk with them after work.

7

36.     In or about January 2018, Defendant GenomOncology hired another female executive, COO Gina Drobnik, who was the Chief Operating Officer ("COO Drobnik").

37.     CCO Choi, however, left Defendant GenomOncology in August 2018 because of the way that Defendant Wertz "mansplained" to her and discounted her expertise as a medical doctor, upon information and belief simply because she was a woman.

38.     Plaintiff was extremely relieved that COO Drobnik joined the team so that she was not the only woman on the executive team, and she and COO Drobnik worked seamlessly together.

39.     Soon, however, Defendant Wertz began directing his misogyny and hostility against COO Drobnik as well, and he was belittling, degrading. and condescending to her as well.

40.     In meetings, Defendant Wertz expected the participants to listen to his lectures, even though they were often not about Defendant GenomOncology or its business, but were nonsensical stories and loud rants, and had no productive value for the company. He spent hours of the team's time droning on and on about things that were not related to their company, and Plaintiff lost valuable sales time going to these meetings.

41.     Founder Glynias repeatedly and consistently complained to Plaintiff about Defendant Wertz and how "useless" he was. He told Plaintiff that Defendant Wertz "lied to the Board," but did not give details.  Plaintiff was a commensurate professional businesswoman, and did not want to get involved, and she worried that any criticisms of Defendant Wertz by her would get back to him, so she mostly stayed silent while Founder Glynias ranted against him.

**Plaintiff and COO Drobnik Object to and Challenge Defendant Wertz's Discriminatory Behavior Towards Them, and He Erupts in Fury**

42.     Plaintiff and COO Drobnik politely challenged Defendant Wertz's discriminatory behavior, but this only made him more furious and act out more.  They repeatedly tried to get the meetings to focus on management and sales issues instead of his rants against them as women, and

tried to tell Defendant Wertz about issues that they were having with competitor companies. They asked Defendant Wertz to hire more medical specialists and MDs as their competitors were doing, or to increase the Business Development team so that they could make more sales, and he always refused their suggestions and ideas with fury in the meetings.

43.     When they tried to change his mind or convince him of their business strategies in any way, shape of form, he repeatedly and consistently called them "argumentative" "difficult," "hard to work with," "demanding," or" emotional," and this became a running refrain with him that was directed only at female employees. These are all stereotypes that are assigned to women who try and challenge men in the workplace, as if strong women should never allegedly "challenge" men, and women should be "submissive" to men. He also belittled the women in front of the other men, which was embarrassing to them.

44.     After the meetings, Defendant Wertz would berate Plaintiff for "making him look bad" at the meetings. When Plaintiff and COO Drobnik tried to talk to him about issues that they had *during* the meeting with how he treated them and made them look to their co-workers, he again dismissed her and COO Drobnik as "difficult," "argumentative" and "too emotional."

45.     In response, Plaintiff routinely stated, "I'm not being emotional, I am being perfectly calm," or "I'm not being difficult, I am just expressing a different opinion from you," and "I don't like to be treated this way," but he only reacted in anger.

46.     Plaintiff and COO Drobnik repeatedly planned early morning meetings without Defendant Wertz so that they could discuss real business issues without him waylaying them, and without him degrading, belittling, and condescending to Plaintiff and COO Drobnik as women, and shutting down every single one of their ideas.

47.     When Defendant Wertz saw that Plaintiff and COO Drobnik had strategy and business meetings, he snidely said that she had COO Drobnik had their "meetings" and bizarrely accused them of "plotting" against him.

48.     Whenever Plaintiff and COO Drobnik brought up the fact that Defendant GenomOncology had "lost some deals" to a competitor, and ways in which to bring on resources that would help them compete, Defendant Wertz blew up in anger, screaming that this discussion was "not part of the agenda." He then berated Plaintiff and COO Drobnik after the meeting for "derailing" the meeting.

49.     He angrily told Plaintiff to focus on the sales that he wanted her to focus on, even where they were not the most lucrative or important sales to Defendant, as if he knew better than Plaintiff what were the best sales for Defendant.

50.     When Defendant Wertz told Plaintiff he wanted to "take over" a sale, she objected to him and said that given her title and experience, she needed to be included.  Defendant Wertz brushed her off and became angry, saying "I've done this a million times before," or "I've made millions of dollars" [at his former company]. Upon information and belief, Defendant Wertz insisted on taking over deals because he did not believe that women in the workplace should be in charge of their own deals and because he believed that men were better able to get deals completed.

51.     Plaintiff was upset and anxious about Defendant Wertz's harassing behavior towards women and her as a woman, but she truly believed in the company and wanted it to grow and succeed. She had a stellar relationship with her team and her clients.

### Defendant Wertz Creates a Hostile Work Environment for Gay Employees

52.     In or about 2018, a female employee raised her hand and said that she would like Defendant GenomOncology to do more for the LGBTQ community, Defendant Wertz said

contemptuously "I'm an authority on gay people. My best friend is gay."  After the meeting, the female employee told Plaintiff that a fellow employee who was gay was "afraid to come out" as gay, because he was fearful at what Defendant Wertz would say, given the straight-male "bro" environment there.

53.     Plaintiff approached Defendant Wertz and said in a calm manner that he shouldn't say things like he was the "authority on gay people" because it might be insulting to LGBT employees, and suggested that he listen to Defendant employees' suggestions about getting more involved in the LGBT community, but he became furious at her yet again.  He called her "ridiculous" and repeated that he knew all about "gay people," and that he certainly didn't need to talk to employees about these issues.  Upon information and belief, Defendant Wertz was angry at Plaintiff for trying to encourage him to not make offensive comments about LGBT people, and for asking him to listen to LGBT employees' concerns.

**Defendant Wertz Refuses to Terminate an Over-paid and Ineffectual Male Employee**

54.     When Plaintiff started working with CSO Lasecki and VP Parikh to try and grow and develop Defendant GenomOncology's sales, she was shocked that although they had been working at Defendant GenomOncology for several years, neither CSO Lasecki nor VP Parikh had made a single sale in over two years. She knew that if Defendant GenomOncology continued like this, it would never reach its sales potential. She on, the other hand, was already on her way to making several sales just in the first six months of being there.

55.     Plaintiff tried working alongside CSO Lasecki and VP Parikh for several months, but she soon saw that they could not make sales and needed to be laid off or fired.

56.     Eventually, VP Parikh decided to leave because, upon information and belief, he knew that Plaintiff was scrutinizing his sales and left before he could be laid off.

57.     Plaintiff approached Defendant Wertz and told him that CSO Lasecki was unproductive, did not and could not make sales, and could not do his job, and asked that he be laid off. She said that in order to succeed at Defendant GenomOncology, she was going to have to work with executives that could make sales, and told him that instead of paying CSO Lasecki to perform poorly, they could bring in salespeople who could "actually produce." Defendant Wertz refused to do so, saying "He's a nice guy" and "he's a great guy," clearly keeping them on because he was his male "buddy" at the company, whom he liked to golf and drink with.

58.     Plaintiff and Founder Glynias frequently spoke about CSO Lasecki. She reminded Founder Glynias that although she had already made several sales that had benefited Defendant GenomOncology, CSO Lasecki had not made a sale in over two years. Founder Glynias complained furiously that CSO Lasecki didn't "do anything" and he certainly wasn't worth his salary of $292,000.

59.     Plaintiff was stunned. Defendant Wertz had denied Plaintiff the salary that she deserved and made her take a pay cut to $170,000, but paid her male colleague $292,000, which was $127,000 more than she was paid.

60.     Not knowing what to do, Plaintiff asked Vic Paroni, the Chief Financial Officer ("CFO Paroni") if CSO Lasecki truly did earn $292,000, and he rolled his eyes, and confirmed that he did, saying Founder Glynias should not have told her that.

61.     Upon information and belief, Defendant GenomOncology paid similarly-situated or even higher titled female employees, including Plaintiff, less than it paid male employees who worked at Defendant GenomOncology. Upon information and belief, this also included CSO Lasecki and VP Parikh.

62.     Plaintiff repeatedly told Defendant Wertz that he should fire or let go of CSO Lasecki because he simply was not contributing to the company, but he repeatedly refused to do so because he was his "buddy."

63.     When speaking about how CSO Lasecki should be let go, Plaintiff stated to Defendant Wertz: "I know how much he makes, you know," referring to his far higher salary than hers, even though he was her equal in position-and was performing at a level much lower than she was. Defendant Wertz stated belligerently that he was not the one who set his salary (the old CEO had) and Plaintiff responded calmly: "But you're the one who is paying it, and he is not bringing in any business."

64.     Defendant Wertz eventually, and very reluctantly, laid CSO Lasecki off, but he failed to rectify the clear, discriminatory, gender pay disparity.

65.     Defendant Wertz repeatedly displayed outright anger and disgust at Plaintiff for calling out the unequal pay and for standing up for herself and because he was forced to fire CSO Lasecki.

**Plaintiff Hires Her Own Team and is Extremely Successful
at Defendant GenomOncology**

66.     Soon, Plaintiff hired her own team and was immediately extremely successful at Defendant GenomOncology.

67.     Although the former titles for CSO Lasecki and VP Parikh were not replaced on the executive team, she hired a sales team consisting of Chris Young ("Sales Associate Young"), Frank McMullen ("Sales Associate McMullen"), and AJ Sura ("Sales Associate Sura").

68.     She completely revamped all sales operations, contracts, and proposals, and implemented new pricing.

69.     She also made a vast number of business sales with her contacts in oncology and in cancer centers.

70.     She met with potential investors and strategic partners, followed through, and finalized deals, and brought in millions of dollars in sales to Defendant GenomOncology.

71.     Plaintiff and COO Drobnik were successfully growing the company together, and received praise from their teams, clients, and the Board.

**Plaintiff Repeatedly Asks for Pay Equity,
and More Staff**

72.     After her first year at Defendant GenomOncology, Plaintiff repeatedly asked Defendant Wertz to increase her salary, as he had promised during her interview.  She also asked for a larger team so that she could increase sales exponentially. She knew that CSO Lasecki had made twice as much money as she did, and she wanted to be compensated as much as he was.

73.     Plaintiff additionally asked Defendant Wertz for the higher title of "Chief Commercial Officer," which had been COO Choi's title before she left. She asked Defendant Wertz what steps she could take to reach that goal, and asked for him to create metrics by which she could measure her progress towards that goal.

74.     She also asked him for the bonuses that he promised her when she was hired, but never materialized.

75.     Defendant Wertz ignored her entreaties repeatedly, but then finally, in or about September 2018, Plaintiff received a raise from $170,000 to $200,000.  This was still far less than the salary of her male colleague when she started.

76.     Upon information and belief, Plaintiff's salary was still less than similarly situated and even less-titled male managers or executives at Defendant GenomOncology.  Also, upon

information and belief, male executives such as CTO Maurer and VP Yeakly did get cash bonuses in the years that Plaintiff did not.

**Defendant Wertz Repeatedly Discriminates Against Female Staff**

77.     Plaintiff noticed that Defendant Wertz always showed up for meetings with a male employee, Sales Associate Young, and joked and laughed with him, and she could clearly see that Defendant Wertz had meetings and discussed business issues with Sales Associate Young. In contrast, Plaintiff noticed that he did not to do the same with Sales Associate Sura, a woman. In fact, Defendant Wertz repeatedly put off Sales Associate Sura when she asked for a meeting with him, and cancelled meetings with her last minute.

78.     On another occasion, when the staff was working remotely due to the Covid-19 pandemic, Defendant Wertz told Plaintiff that he was inviting Sales Associate Young to the office to hang out with him, drink with him, and play a game of golf with him. Plaintiff asked Defendant Wertz: "Hey, why didn't you invite" Sales Associate Sura, the female Sales Associate. Defendant Wertz made an excuse that Sales Associate Sura would have to "travel farther" to get to the Cleveland office to meet them, and Plaintiff stated:  "That may be true, but the offer should be extended to her." Upon information and belief, Defendant Wertz did not extend the same invitation to Sales Associate Sura.  Also, upon information and belief, Defendant Wertz repeatedly invited Sales Associate Young to other business and social events, and did not invite Sales Associate Sura.

**Plaintiff Announces She is Pregnant, But There is no Human Resources**

79.     In or about September 2019, Plaintiff found out she was pregnant, but because of medical complications decided not to tell Defendant Wertz before her 20th week.

80.     In or about December 2019, Charing Party told Defendant Wertz she was pregnant. Defendant Wertz said he was happy for her, but since Defendant GenomOncology did not have a

Human Resources Department, and she was the first employee to announce that she was pregnant, she should "work out" her maternity leave with COO Drobnik.

81.     He told Plaintiff that he wanted to attend her Business Development meetings while she was out on maternity leave, but Plaintiff was afraid that Defendant Wertz would yell at her female colleagues or give bad advice, and so she asked COO Drobnik to stay involved in the Business Development meetings, and COO Drobnik agreed.

82.     COO Drobnik and she worked together to develop the maternity plan. Plaintiff would receive 16 weeks of maternity leave that would be paid 60% by disability leave, and 40% by Defendant GenomOncology.

83.     When it was time to present the maternity leave proposal to Defendant Wertz, Plaintiff offered to present it to him along with COO Drobnik, but COO Drobnik said that she didn't want Plaintiff to have to deal with Defendant Wertz's discriminatory rants, particularly since she was the one asking for maternity leave, so she would do it herself.

### Defendant Wertz Forces Plaintiff to Work on Maternity Leave

84.     On or about May 13, 2020, Plaintiff went on maternity leave. During her maternity leave, as she was recovering from a Caesarian Section, Defendant Wertz called Plaintiff incessantly to ask about deals, force her to call potential investors, and do various tasks.

85.     Because Plaintiff was the very first female employee at Defendant GenomOncology to take maternity leave, she was worried that her career at Defendant GenomOncology would suffer, that she would be retaliated against, and that Defendant Wertz would treat her with even more hostility because of her leave.

86.     Plaintiff was forced to answer his phone calls and do the tasks that Defendant Wertz ordered her to do.

87. Upon information and belief, because Defendant GenomOncology had no official Human Resources department, Plaintiff was not advised of her rights as a woman and/or a mother when she was on maternity leave.

88. One deal that Defendant Wertz was "working on" while she was on maternity leave was a complete mess – nothing was getting done, there was no forward movement, and Defendant Wertz was sabotaging the deal. When Plaintiff called to save the deal from her maternity leave, the client said to her:  "Thank god you're back involved," and that they could not deal with Defendant Wertz.

**Plaintiff Returns From Maternity Leave**

89. On or about September 8, 2020, Plaintiff returned from maternity leave.

90. Plaintiff worked just as hard and was just as successful at Defendant GenomOncology as she had been before her pregnancy and maternity leave.  Periodically, as happens with a newborn, Defendant had to miss work or leave work early because of issues with her infant, or with her nanny.

91. Upon information and belief, Defendant Wertz became angry and resentful for Plaintiff for missing work because of her childcare duties.

**Defendant Wertz Actively Sabotages Deals with his Gender
Discriminatory Behavior Towards Clients**

92. Plaintiff was extremely frustrated because not only did Defendant Wertz subject her and COO Drobnik to a hostile work environment as women, but he also sabotaged deals that Plaintiff had worked on for many months with his gender discriminatory behavior.

93. He insisted on being on calls with clients, even though later Plaintiff received word that female partners, whom he regularly disrespected, did not want to deal with him, but only with Plaintiff. Having him on calls, with his lack of knowledge of the industry, and demeaning attitude

towards women, made clients think that Defendant GenomOncology did not know the industry or were discriminatory towards women, and they lost deals as a result. He continued to interrupt and disrespect Plaintiff in phone calls with clients.

94.     When talking with the Senior Director of Medical Affairs of a potential client, who was a woman, he cut her off and asked the male executives more questions than he asked her, even though she was their boss. After the meeting, she told Plaintiff that she did not want to deal with Defendant Wertz, cut him out of the meetings, and only spoke to Plaintiff.

### Plaintiff Again Asks for Pay Equity

95.     In or about February 2021, Plaintiff again asked for pay equity and a salary that was commensurate with her experience and success at Defendant GenomOncology. She asked Defendant Wertz what she could do in order to get a raise, and a higher title of Chief Commercial Officer.

96.     She also asked for the cash bonuses that Defendant Wertz had promised her when he hired her, and that he had not given her once since she started.

97.     Defendant Wertz thanked Plaintiff for "the way she approached the conversation," and said that he had to "talk to the Board."

98.     Upon information and belief, Defendant Wertz never did "talk to the Board" about giving Plaintiff a higher salary.

### Defendant Wertz Brings in Serial Sexual Harasser to Run "Human Resources," "Culture" and "Recruiting"

99.     In or about May 2021, Defendant Wertz brought in an outside consultant and male "buddy" of his, Ron Laneve, and called him a "Talent Management Consultant" ("Consultant Laneve") to handle "Human Resources," "culture" and "recruiting."

100.    Plaintiff was told by an employee who had previously worked with Consultant Laneve that he was a known sexual harasser at his former workplace. In this workplace, Defendant Wertz had been the President of the company, and was "buddies" with Consultant Laneve.  When the first incident of sexual harassment had occurred, Defendant Wertz would not fire him, but after a second incident, Defendant Wertz was, finally, forced to fire Consultant Laneve.

101.    Plaintiff was shocked that Defendant Wertz would bring to Defendant GenomOncology a known sexual harasser, but was sure that this was because of the "bro" environment in which Defendant Wertz hired his male "buddies" who were unqualified, and whom he could go out golfing, drinking and "party" with. Still, Plaintiff was shocked that Defendant Wertz was knowingly subjecting his female employees to potential sexual harassment by Consultant Laneve, a known sexual harasser AND that this person was hired to take over "Human Resources" at GenomOncology.

102.    Plaintiff spoke to Jeff Smith VP of Finance ("VP Smith") about Consultant Laneve, saying that she was extremely concerned that Defendant Wertz had brought in "a sexual harasser" who had been fired by Defendant Wertz from his previous job, especially for a Human Resources position. VP Smith simply stated: "Yeah, I don't trust him."

103.    It was unclear to either Plaintiff what Consultant Laneve would be "doing" at Defendant GenomOncology that would be valuable to the company, and she was disappointed that Defendant Wertz would hire him instead of hiring a larger team that Plaintiff had been asking for repeatedly.

**Consultant Laneve is Condescending to Plaintiff**

104.     Consultant Laneve was also condescending and disrespectful of Plaintiff. When Plaintiff asked a clarifying question about an issue, he said condescendingly that he was sorry that the issue was "too hard" or "too complicated" for her.

105.     He also ignored Plaintiff in video meetings, and never responded to her email inquiries unless, out of frustration at his utter lack of communication with her, she cc:ed Defendant Wertz.

**Defendant Wertz Tells Plaintiff She Is "Valuable" to the Company, and That She Will Receive a Raise Commensurate With Her Success, and Additional Team Members**

106.     On or about July 22, 2021 in the morning, Defendant Wertz called Plaintiff on the phone. He told Plaintiff that she was "valuable" to the company, and that he would approve a raise, and give her the larger team, with more employees, that she had asked for.

107.     He also said that when he got back from vacation, they would speak and discuss how he would get Plaintiff to a salary of $250K by the end of 2021 and $350K by the end of 2022.

108.     Plaintiff was surprised, and was excited that by the end of 2022 at least, she would finally be paid a salary that was commensurate with her experience and success at bringing in millions of dollars of business to Defendant GenomOncology.  She was also excited to grow her team so that she could bring in even more business.

**Defendant GenomOncology Suddenly Fires its Only Female Executive Member, and One Who Challenged Defendant Wertz, and Promotes Two Men**

109.     That same day, on or about July 22, 2021, later in the morning, Defendant Wertz sent an email announcing that COO Drobnik was fired, and that Jeff Smith and Joe McCrone, two male employees, had received promotions.  Jeff Smith was promoted to be SVP of Finance ("SVP Smith"), and Joe McCrone was promoted to be SVP of Client Services ("SVP McCrone"), with

the Account Management, Product Specialist, and Curation groups reporting to SVP McCrone. These were former reports and duties assigned to COO Drobnik. Defendant Wertz had fired the only female executive at Defendant GenomOncology, and given those responsibilities to men.

110.    Plaintiff was absolutely shocked. Even though she was in management at Defendant GenomOncology, she was not consulted regarding COO Drobnik's termination, nor was she in meetings where it was discussed. Upon information and belief, this decision was made by Defendant Wertz and the male members of the executive team, and without her, the only female executive on the team.

111.    In addition, upon information and belief, Defendant Wertz fired COO Drobnik, simply because she was a woman, and because she dared to challenge Defendant Wertz on his behavior towards herself and Plaintiff, and other women outside the company.

112.    COO Drobnik's team told Plaintiff that they were "in shock" that COO Drobnik had been fired, because she was such a popular and effective manager. More specifically, young female employees who had been on COO Drobnik's team told Plaintiff that they were particularly upset at COO Drobnik's firing because they could "trust" her, unlike Defendant Wertz and the other men at Defendant GenomOncology.

113.    Knowing that Defendant Wertz only fired COO Drobnik because she was a woman who challenged his authority, Plaintiff was terrified that she would also be fired. She reported to SVP Smith that because of COO Drobnik's firing she felt like she had a "target on her back."

114.    SVP Smith tried to reassure her by telling her that "everyone" knew what a good job she did, and how "vital" she was to the company, but Plaintiff was not reassured, given Defendant Wertz's hostility towards her, COO Drobnik, and women in general.

**Plaintiff Tells Defendant Wertz She Fears She Has a "Target on Her Back"**

115.    In or about August 2021, Defendant Wertz, Plaintiff, and the executive team attended an executive meeting, which was being run by Consultant Laneve.  VP Yeakly stated that he felt that COO Drobnik's terminated and been "poorly handled," and that a lot of employees had "questions" that were not being answered. Defendant Wertz angrily told the group that it wasn't "his" responsibility, but that each department should convey "the message" with their own employees, and Plaintiff stated:  "I'm talking to people who are not in my department who are worried and upset."

116.    Consultant Laneve began furiously riddling Plaintiff with questions about who it was that she had "talked to," and Plaintiff stated: "I would prefer to keep this confidential, because we don't have an HR [Human Resources] department, and I want to keep it in a safe space."

117.    At the end of the meeting, Consultant Laneve asked Plaintiff condescendingly if she had "anything else to add," and she said "no," that she was "just listening."

118.    Following the meeting, Defendant Wertz began berating her, as per usual, saying furiously that her answer to Consultant Laneve, that she was "just listening," had been "unprofessional" and that this was not how an "executive" should act.

119.    In response, Plaintiff told Defendant Wertz: "Why can't I take things in," and "I feel like I'm on an island, and I have a target on my back," In response, Defendant Wertz dismissed her angrily and discontinued the conversation.

**Plaintiff Challenges a Lie that
Defendant Wertz Tells the Board**

120.    On or about August 9, 2021, Plaintiff presented to the Board of Directors, and Defendant Wertz and the executive team were present. Plaintiff began the meeting discussing their sales results, and recent opportunities and deals that were of note.

121.    At one point, Defendant Wertz interrupted Plaintiff, as per usual, and told the Board that Defendant GenomOncology "had no competitors," which was simply not true.   Upon information and belief, Defendant Wertz lied to the Board in order to convince them that Defendant GenomOncology was more profitable and successful than it was.

122.    Plaintiff, knowing how important it was to be utterly transparent with the Board, very calmly told the Board that in fact, they did have a few competitors, and named them. Defendant Wertz loudly and furiously interrupted her and tried to prove her wrong, but she calmly stood her ground.

123.    Following the meeting, SVP Smith sent Plaintiff a text message that told her she had done a "excellent job" at the meeting and had "come across very well."  He also told Plaintiff that Defendant Wertz "spoke highly" of her, which was surprising to her, given his discriminatory and hostile behavior towards her.

124.    Plaintiff also received praise from two members of the Board of Directors for her performance presenting at the Board Meeting.

**Plaintiff Finds Out From Her Team that Her Team is to be "Reorganized"**

125.    In or about late August 2021, Plaintiff went on vacation to visit family. She took work calls while she was on vacation and had a call with Defendant Wertz about a potential opportunity.

126.    On or about September 9, 2021, Plaintiff returned from vacation.  Her team told her, alarmed, that Defendant Wertz told them that there was "possibly going to be a reorganization of the BD [Business Development] team," of which Plaintiff was the head.

127.    Plaintiff had no warning and no idea that this was going to be implemented, and she became alarmed yet again that Defendant Wertz was setting her up for termination, like COO

Drobnik, simply because she was a woman, and because she was a female businesswoman who dared to challenge him.

## Defendant Wertz Stalls on a Meeting With Her

128.     On the same day, on or about September 9, 2021, Plaintiff scheduled a phone call in the office scheduling calendar to talk with Defendant Wertz about this potential "reorganization" of her team, but Defendant Wertz cancelled that meeting.  He told Plaintiff that he cancelled the meeting because he thought it was best to talk in person with SVP Smith when she came to the office in Cleveland, Ohio on September 13, 2021 for meetings at Defendant GenomOncology. She was also scheduled to appear in a video for potential clients on September 14, 2021.

129.     Plaintiff was shocked that Defendant Wertz would unilaterally cancel the meeting and again was anxious that Defendant Wertz was setting her up for termination, as he did with COO Drobnik because she was a woman.

130.     She returned Defendant Wertz's email and pressed him to meet her that day to explain the reorganization, and the fact that she was not involved in the decision to reorganize her team.  He refused to speak with her that day and insisted that they meet when she was in Cleveland.

## Plaintiff Suffers a Mental Health Crisis Because of the Anxiety

131.     The days leading up to her trip to Cleveland, Plaintiff felt extremely anxious about the meeting, and experienced physical manifestations of that anxiety including shortness of breath, pounding heartbeat, headaches, and loss of appetite about the way that she was treated.  She saw how COO Drobnik had been terminated without notice, and the fact that Defendant Wertz refused to meet with her made her extremely anxious that she, too, would be summarily terminated.

132.    On or about September 11, 2021, Plaintiff had a panic attack and went to an outpatient medical center as she couldn't catch her breath. The doctor at the medical center diagnosed her with anxiety.

### Plaintiff Has a Scathing and Discriminatory Meeting
### With Defendant Wertz and SVP Smith

133.    On or about September 13, 2021, Plaintiff flew to Cleveland to have in-person meetings since this was the first opportunity to do so since the Covid-19 pandemic began.

134.    Also, on or about September 13, 2021, Plaintiff met with Defendant Wertz and SVP Smith for her scheduled dinner, at a restaurant in Cleveland. Over the course of five hours, Defendant Wertz screamed at and berated Plaintiff at full volume in the restaurant, which embarrassed and ashamed Plaintiff.

135.    Defendant Wertz first began disparaging COO Drobnik, citing performance issues that were simply not true. When Plaintiff defended COO Drobnik's performance by saying she had excelled at her job, he told Plaintiff that COO Drobnik had "poisoned" her.  He also said that Plaintiff and COO Drobnik were "negative" and "argumentative," and were "poison" together, as if the fact that the female businesswomen had collaborated together as women and sometimes disagreed with Defendant Wertz's ideas, decisions, or behaviors made them "argumentative" and "poisonous."

136.    Plaintiff asked why she had not been involved in conversations about COO Drobnik's termination, and Defendant Wertz bizarrely and sarcastically responded:  "We didn't tell you about her firing to protect your friendship with her.".

137.    Plaintiff inquired about the salary raises that were promised to her to get her to equal pay and the promise to build her Business Development team.  Defendant Wertz suddenly

denied that he had offered her a raise at all and said that her "options" were worth "$1 to 3 million," which Plaintiff knew was not true.

138.    Defendant Wertz then started to belittle and disparage Plaintiff herself, saying that "no one liked working with" her, and that her team "hated her."  When Plaintiff pressed for details, Defendant Wertz was, not surprisingly, unable to do so.

139.    Defendant Wertz then accused Plaintiff of wanting to terminate CTO Maurer and VP Yeakly, which was simply not true. In fact, it had been COO Drobnik who had suggested this to Defendant Wertz (due to their poor performance), making it clear that Defendant Wertz could not differentiate between his two female executive team members because they were women. When Plaintiff pointed out that it had been COO Drobnik, and SVP Smith backed her up, saying "Yes, this was [COO Drobnik,]" Defendant Wertz became even more furious that he was contradicted.

140.    Shockingly, in saying that her team "had issues" with her, which was not true, Defendant Wertz made a statement about his niece's "gang rape."  Plaintiff had no idea what he had said except for the term "gang rape," which was incredibly explosive and upsetting to her as a woman, but stated:  "Oh my god, I'm sorry that happened. But what does that have to do with me?"

141.    Defendant Wertz then berated Plaintiff for taking her maternity leave, which was guaranteed to her by Defendant GenomOncology, stating:  "You took half a year, I paid out of my own pocket for you, you owe me" and "I spent hundreds of dollars on your baby gift!!"  Plaintiff reminded Defendant Wertz that she only took as much maternity leave as had been guaranteed to her by Defendant GenomOncology, and in fact had taken business calls from him while she was on maternity leave.

142.     Upon information and belief, Defendant Wertz denigrated Plaintiff because she had taken maternity leave, and did not believe that she was as valuable to the company or as deserving of advancement simply because she had taken maternity leave and was a working mother.

143.     Plaintiff again asked about recruiting more members for her team, as he had also promised her, and Defendant Wertz said: "We interviewed one woman who said as long as you are here, she wouldn't work here."  Shocked, Plaintiff asked who this was, and Defendant Wertz disparaged yet another woman, saying "She was a fucking idiot."

144.     Defendant Wertz screamed and yelled at Plaintiff that in the August 9, 2021 Board Meeting, she had "contradicted" him, and that a Board Member asked if he was "OK," but he told the Board Member that Plaintiff was probably just "upset" about COO Drobnik's firing, again accusing Plaintiff of being "too emotional." Plaintiff defended her work, saying that two Board members had emailed her and told her what an excellent job she had done, and in fact, she had done an excellent job. She said that she did not "contradict" him, but only pointed out that he had said that Defendant GenomOncology had "no competitors," which was not true.

145.     Plaintiff calmly defended her record at Defendant GenomOncology, saying that since she had started on June 21, 2017, she brought in over $4 million in sales.  Defendant Wertz responded that this was "debatable" and that Defendant GenomOncology "probably would have gotten those accounts anyway."  Plaintiff pressed Defendant Wertz on this falsehood, reminding him that she had brought in all of her prior experience with oncologists and cancer centers, and had single-handedly broke Defendant GenomOncology into those markets.

146.     When Plaintiff stood up for herself, but always in a calm manner, Defendant Wertz became even furious and screamed:  "I don't know why I even bother trying to talk to you!" and refused to engage in a calm discussion.

147.    Plaintiff tried to get Defendant Wertz to focus on the future instead of the past, saying:  "I want to figure out a path forward." SVP Smith, too, said: "Let's not get caught up on the past."

148.    When Defendant Wertz went to the restroom, a restaurant patron, who had heard Defendant Wertz furious and belligerent rant at Plaintiff, walked up to Plaintiff's table and said to Plaintiff "That guy is a fucking asshole, and you shouldn't put up with it."  Plaintiff was extremely embarrassed the Defendant Wertz's rage and insults at her were so loud and belligerent it could be heard by other customers.

149.    Finally, after many hours of his fury, and feeling anxious and depressed. Plaintiff said: "It seems like you want my resignation" and got up from the table and left.  Plaintiff was in shock, and in no way wanted to resign from a job that she loved because of its product and her clients, but felt as if she had no other option in order to get away from Defendant Wertz's abusive and belligerent rants, and the hostile work environment towards her as a woman.

150.    Plaintiff then sent a text message to Defendant Wertz at 10:58 pm, stating:

due to the conversation this evening, with no resolution even though I tried to come to a solution, I interpret this as the company's termination of my employment. I'll be expecting my separation paperwork from Jeff tomorrow.

**Plaintiff Speaks to SVP Smith about the Severe Discrimination**

151.    That same evening, September 13, 2021, Plaintiff called SVP Smith, crying. She told him that she could not believe that Defendant Wertz had just spent five hours screaming at her and berating her and telling her that her team hated her.  She told SVP Smith that this was a "hostile work environment," and that it sounded like Defendant Wertz wanted her fired. SVP Smith told her that he, too, was shocked by the conversation, and that he "didn't think this was

how it was going to go."  He told Plaintiff that Defendant Wertz "really respects you," and "wanted

to make things work." After a short conversation, she hung up.

### Plaintiff Reports the Discrimination and Retaliation
### to Defendant GenomOncology

152.    On or about September 13, 2021, Plaintiff felt anxious, depressed, despondent, and

sick to her stomach.  She could not possibly face Defendant Wertz at work the next day after his

gender discriminatory rant at her the night before, and given the anxiety and depressions, and

physical manifestations of that anxiety and depression she was experiencing.  Plaintiff sent the

following email to Defendant Wertz and SVP Smith regarding her presence at the office that day:

> Brad,
>
> The main points I took away from our conversation this evening were unanticipated,
> extremely negative and disparaging. The hostility that you directed towards me regarding
> my maternity leave, the executive team's and the internal team's opinion of me, is
> alarming. I am not comfortable coming into the office tomorrow.
>
> I will follow up with Jeff on next steps when I am back in New York.

153.    Plaintiff returned to New York that morning.  For the following days, Plaintiff

experienced the severe physical manifestations of anxiety and depression due to her discriminatory

treatment.

154.    Plaintiff immediately sought out a psychotherapist for treatment due to the anxiety

and depression she experienced, and her therapist diagnosed he with anxiety, depression, and

PTSD (post-traumatic stress disorder) due to the extreme discrimination she experienced.

### Plaintiff Is Terminated

155.    On or about September 15, 2021, the next day, Plaintiff learned that she was locked

out of every system at Defendant GenomOncology and could not communicate via the inter-office

system or her email.  As she suspected, she had been terminated from Defendant GenomOncology

because she was a woman, a female businesswoman who had dared to stand up to Defendant Wertz

as a male, had successfully collaborated with another strong female businesswoman and stood up

for that woman when she was discriminated against, because she had asked for pay equity, and in

retaliation for standing up for herself and for another woman who had been discriminated against.

156.    Upon information and belief, Defendant GenomOncology's Executive Team and

the Board of Directors remain entirely male and white, and Defendant Wertz continues to openly

discriminate against, attack and underpay female employees while embracing, celebrating and

overpaying male employees

## AS AND FOR THE FIRST CAUSE OF ACTION

*(Gender and Pregnancy-Related Discrimination in Violation
of the Title VII)*

157.    Plaintiff re-alleges and incorporates by reference each and every allegation in each

and every aforementioned paragraph as if fully set forth herein.

158.    Defendants discriminated against Plaintiff on the basis of her gender and pregnancy

in violation of Title VII. Plaintiff has suffered both disparate impact and disparate treatment as a

result of Defendants' wrongful conduct.

159.    Defendants conduct has been intentional, deliberate, willful, malicious, reckless

and conducted in callous disregard of the rights of Plaintiff, entitling Plaintiff to punitive damages.

160.    By reason of Defendants discrimination, Plaintiff is entitled to all remedies

available for violations of Title VII.  Plaintiff shall seek attorney's fees and punitive damages.

## AS AND FOR THE SECOND CAUSE OF ACTION

*(Gender and Pregnancy-Related Discrimination in Violation
of the New York State Human Rights Law and New York City Human Rights Law)*

161.    Plaintiff re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

162.    Defendants discriminated against Plaintiff on the basis of her gender and pregnancy in violation of New York State Human Rights Law and New York City Human Rights Law. Plaintiff has suffered both disparate impact and disparate treatment as a result of Defendants' wrongful conduct.

163.    Defendants conduct has been intentional, deliberate, willful, malicious, reckless and conducted in callous disregard of the rights of Plaintiff, entitling Plaintiff to punitive damages.

164.    By reason of Defendants discrimination, Plaintiff is entitled to all remedies available for violations of New York State Human Rights Law and New York City Human Rights Law. Plaintiff shall seek attorney's fees and punitive damages.

## AS AND FOR THE THIRD CAUSE OF ACTION
*(Retaliation in Violation of Title VII)*

165.     Plaintiff re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

166.    Plaintiff reported to Defendants about their discriminatory treatment of her.

167.    In retaliation, Defendants subjected Plaintiff to a series of adverse employment actions including, but not limited to, subjecting Plaintiff to a hostile work environment, termination, and other forms of retaliation.

168.    Defendants conduct has been intentional, deliberate, willful, malicious, reckless and conducted in callous disregard of the rights of Plaintiff.

169.    As a result of Defendants conduct alleged in this Complaint, Plaintiff has suffered and continues to suffer harm, including but not limited to lost earnings, lost benefits, other financial loss, and non-economic damages.

170.    By reason of Defendants retaliation, Plaintiff is entitled to all remedies available for violations of Title VII as to Defendants.  Plaintiff shall seek attorney's fees and punitive damages.

## AS AND FOR THE FOURTH CAUSE OF ACTION
*(Retaliation in Violation of the New York State Human Rights Law*
*and the New York City Human Rights Law against Defendant)*

171.    Plaintiff re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

172.    Plaintiff reported to Defendants about their discriminatory treatment of her.

173.    In retaliation, Defendants subjected Plaintiff to a series of adverse employment actions including, but not limited to, subjecting Plaintiff to a hostile work environment, termination, and other forms of retaliation.

174.    Defendants conduct has been intentional, deliberate, willful, malicious, reckless and conducted in callous disregard of the rights of Plaintiff.

175.    As a result of Defendants conduct alleged in this Complaint, Plaintiff has suffered and continues to suffer harm, including but not limited to lost earnings, lost benefits, other financial loss, and non-economic damages.

176.    By reason of Defendants retaliation, Plaintiff is entitled to all remedies available for violations of the New York State Human Rights Law and the New York City Human Rights Law as to Defendants.  Plaintiff shall seek attorney's fees and punitive damages.

## AND FOR THE FIFTH CAUSE OF ACTION
*(Aiding and abetting discrimination in Violation of the New York State Human Rights Law
and the New York City Human Rights Law against Defendant)
Against Defendant Wertz*

177. Plaintiff re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

178. Defendant Wertz acted to aid and abet the discrimination complained of herein, in violation of the NYSHRL and NRCHRL.

179. As a direct and proximate result of Defendant Wertz's discrimination, Plaintiff has suffered and continues to suffer damages including loss of pay and benefits and severe mental anguish and emotional distress.

180. Defendant Wertz acted intentionally and with malice and/or reckless indifference to Plaintiff's state-law protected rights, entitled Plaintiff to punitive damages.

181. Plaintiff will continue to suffer these damages and until the Court grants all of the relief which he is entitled that is requested herein.

182. As a result of Defendant's violation of the NYSHRL and NYCHRL, Plaintiff has been damaged in the sum of no less than $1,500,000.

## AS AND FOR THE SIXTH CAUSE OF ACTION
*(Unequal Pay in Violation of the Equal Pay Act 29 U.S.C. § 206, et seq.)
Against Defendant GenomOncology*

183. Plaintiff re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

184. The acts and practices of Defendant GenomOncology constitutes discrimination against Plaintiff in violation of the Equal Pay Act by unlawfully paying female employees less than male employees for equal work.

185.    At all relevant times, Defendant GenomOncology was an "employer" engaged in interstate commerce.

186.    At all relevant times, Plaintiff was an employee and Defendant GenomOncology was an employer within the meaning of the Equal Pay Act.

187.    At all relevant times, Defendant GenomOncology employed and/or continue to employ employees, including Plaintiff. At all relevant times, Defendant GenomOncology had gross operating revenues in excess of $500,000.00.

188.    Defendant GenomOncology was aware of complaints and requests for investigation made by Plaintiff concerning the unfair pay practices but did not rectify or investigate its unlawful pay practices.

189.    Defendant GenomOncology's violations of the Equal Pay Act were willful and/or reckless, entitling Plaintiff to the three-year statute of limitations and liquidated damages available under the Equal Pay Act.

<u>**AS AND FOR THE SEVENTH CAUSE OF ACTION**</u>
*(Unequal Pay in Violation of the New York Labor Law)*
*Against Defendant GenomOncology*

190.    Plaintiff re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

191.    The acts and practices of Defendant GenomOncology constitutes discrimination against Plaintiff in violation of the New York Labor Law by unlawfully paying female and pregnant employees less than male and non-pregnant employees for equal work.

192.    At all relevant times, Defendant GenomOncology was an "employer" engaged in interstate commerce.

193.   At all relevant times, Plaintiff was an employee and Defendant GenomOncology was an employer within the meaning of the New York Labor Law.

194.   At all relevant times, Defendant GenomOncology employed and/or continue to employ employees, including Plaintiff. At all relevant times, Defendant GenomOncology had gross operating revenues in excess of $500,000.00.

195.   Defendant GenomOncology was aware of complaints and requests for investigation made by Plaintiff concerning the unfair pay practices but did not rectify or investigate its unlawful pay practices.

## JURY TRIAL DEMANDED

196.   Plaintiff demands a jury trial.

## PRAYER FOR RELIEF

**WHEREFORE**, for the foregoing reasons, it is specifically requested that this Court grant Plaintiff judgment as follows:

i.   Declaring that the Defendants engaged in unlawful discrimination and subjected Plaintiff to a hostile work environment in violation of 42 U.S.C. 1981; Title VII, the NYSHRL, the NYCHRL, and the NYLL;

ii.   Awarding compensatory and punitive damages in an amount to be determined by a jury;

iii.   Awarding damages for emotional distress in an amount to be determined by a jury;

iv.   Awarding the cost, disbursements and legal fees of this action, interest from the date of the verdict rendered hereon and reasonable attorney's fees; and

v.      Granting such other and further relief as this Court may deem just and proper under the

circumstances.

Dated: New York, New York
        October 17, 2022

                                        Respectfully submitted,

                                        GODDARD LAW PLLC
                                        *Attorney for Plaintiff*

                                        By: */s/ Megan S. Goddard*
                                        Megan S. Goddard, Esq.
                                        Katerina Housos, Esq.
                                        39 Broadway, Suite 1540
                                        New York, NY 10006
                                        Office: 646-964-1178
                                        Fax: 212-473-8705
                                        Megan@goddardlawnyc.com
                                        Katerina@goddardlawnyc.com